UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**ORIGINAL**

| | |
|---|---|
| GARY GELMAN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DHB INDUSTRIES, INC., DAVID H. BROOKS, SANDRA HATFIELD, and DAWN M. SCHLEGEL,<br><br>Defendants. | No. **CV 05 4886**<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS **HURLEY, J.**<br><br>**LINDSAY, M.J.**<br><br>**JURY TRIAL DEMAND** |

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

OCT 18 2005

★BROOKLYN OFFICE

Plaintiff Gary Gelman ("Plaintiff") alleges the following based upon the investigation of

Plaintiff's counsel, which included, among other things, a review of defendants' public

documents, conference calls and announcements, United States Securities and Exchange

Commission ("SEC") filings, wire and press releases published by and regarding DHB

Industries, Inc. ("DHB" or the "Company") securities analysts' reports and advisories about the

Company and information readily obtainable on the Internet.

## NATURE OF ACTION

1. This is a federal class action on behalf of purchasers of the publicly traded

securities of DHB between April 21, 2004 and August 29, 2005 (the "Class Period"), seeking to

pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. DHB is a holding company engaged in the manufacture and marketing of

protective body armors. It operates through two divisions, DHB Armor Group and DHB Sports

Group. The complaint alleges that defendants' Class Period representations concerning DHB

were materially false and misleading when made for the following reasons: (1) DHB's body

armor products were unsafe and defective; (2) the Company knew that DHB's body armor

products were unsafe and defective, but continued to falsely represent that its body armor products were safe and of high quality; (3) defendants knew and/or recklessly disregarded that continued sales of its unsafe and defective body armor products could have a material adverse effect on DHB's finances; and (4) DHB lacked adequate internal controls and, as a result, was unable to determine the true financial impact of withdrawal of any of its products.

3.     On August 30, 2005, DHB announced that it would take a third quarter charge of up to $60 million to discontinue production of certain bullet-proof vests because of safety concerns.

4.     Following this announcement, on August 30, 2005, shares of DHB fell $1.56 per share, or 23.42 percent, to close at $5.10 per share on unusually heavy trading volume.

## JURISDICTION AND VENUE

5.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

6.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

7.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company maintains a principal executive office in this Judicial District.

8.     In connection with the acts, conduct and other wrongs alleged in this complaint,

- 2 -

defendants, directly or in⌣ ⌣ectly, used the means and instrumentalities ⌣⌣ interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchanges.

## PARTIES

9.     Plaintiff Gary Gelman, as set forth in the accompanying certification, incorporated by reference herein, purchased DHB securities at artificially inflated prices during the Class Period and has been damaged thereby.

10.     Defendant DHB is a Delaware corporation with its principal place of business situated at 400 Post Avenue, Suite 303, Westbury, NY 11590.

11.     Defendant David H. Brooks ("Brooks") was, at all times relevant hereto, the Company's Chairman and Chief Executive Officer ("CEO").

12.     Defendant Sandra Hatfield ("Hatfield") was, at times relevant hereto, the Company's Chief Operating Officer ("COO") and Head of Government & Special Project Sales.

13.     Defendant Dawn M. Schlegel ("Schlegel") was, at all times relevant hereto, Chief Financial Officer ("CFO") of DHB.

14.     Defendants Brooks, Hatfield and Schlegel are referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of DHB's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be

- 3 -

corrected. Because of the.. positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

15. DHB is a holding company engaged in the manufacture and marketing of protective body armors. It operates through two divisions, DHB Armor Group and DHB Sports Group. The DHB Armor Group develops, manufactures and distributes bullet- and projectile-resistant garments, bullet-resistant and fragmentation vests, bomb projectile blankets, aircraft armor, bullet-resistant plates and shields, and related ballistic accessories for United States armed forces, federal agencies and state and local law enforcement communities. The DHB Sports Group produces and markets protective athletic apparel and equipment, including knee, ankle, elbow, wrist and back supports and braces to athletes, weekend sports enthusiasts and general consumers.

### Materially False And Misleading Statements Issued During The Class Period

16. The Class Period commences on April 21, 2004. On that day the Company issued a press release titled, "Shareholder Derivative Lawsuit Against DHB Industries Discontinued." Therein, the Company stated:

DHB Industries Inc., the market leader in the rapidly growing protective body

- 4 -

armor industry, announced today a second shareholder derivative action against DHB and six of its officers and directors brought in October of 2002 has been discontinued with prejudice. On March 13, 2003, DHB announced the dismissal of another shareholder derivative action against DHB and six of its officers and directors brought by the Plumbers & Pipefitters Local 112 Pension Fund in October of 2002.

With the conclusion of this suit, there are no remaining shareholders or derivative lawsuits outstanding against DHB.

Commenting on the end of the lawsuit, David H. Brooks, Chief Executive Officer of DHB Industries Inc. stated, . . . "We will continue to focus on producing the best protective soft body armor in the world and maximizing shareholder value."

17. On April 29, 2004, DHB announced a current total backlog of firm orders in

hand at a record of approximately $215 million. Moreover, the Company announced that, during

the previous week, DHB's Armor Group had received more than $25 million in new purchase

and delivery orders. Commenting on the announcement, defendant Hatfield stated:

"The demand for the Armor Group's products continues at an unprecedented pace. We continue to receive new purchase orders from every market sector, reflecting the strength of DHB's technology, products and our ability to handle very large volumes. Our expansion efforts are clearly showing early dividends as we continue to provide exceptional life-saving products that exceed the requirements and expectations of our customers while providing unparalleled levels of service and support."

18. On May 6, 2004, DHB, posting its 17th consecutive year-over-year increase in

quarterly revenues, announced record revenues and earnings for the first quarter ended March 31,

2004. The current backlog of firm orders in hand had dramatically increased to an unprecedented

$215 million. For the first quarter ended March 31, 2004, DHB reported record revenues of

$74,403,000, an increase of 61% as compared to revenues of $46,153,000 for the first quarter of

2003. Operating income increased 52% in the first quarter to $10,893,000 as compared to

$7,175,000 in the first quarter of 2003.

- 5 -

19.     Commen.....g on these results, defendant Schlegel statea. The Company met or

exceeded during the first quarter all of its operating goals which it had previously provided as

guidance to the financial community on March 15th [2004]. Selling, general and administrative

expenses declined from the second half of 2003, as expected, due to a significant decline in

extraneous operating expenses. The balance sheet continued to strengthen as stockholders'

equity increased by $6.3 million in the quarter."

20.     Further commenting on these results, defendant Brooks stated:

"DHB Industries' leading position in the protective soft body armor industry has
never been more pronounced. In the past six months, DHB has received two
significant contracts for body armor from the United States Military, $60 million
and $77 million, each of which the Company believes was the largest single
contract for body armor ever awarded by the U.S. Department of Defense at the
time of award. To date, our Point Blank subsidiary, providing life-saving
protection for our troops, has shipped more than 600,000 Interceptor Outer
Tactical Vests to the US military.

Order activity from all four sectors of business -- military, law enforcement,
federal agencies and international is expanding at record levels. We are
particularly enthused with the current activity and future growth prospects in the
international markets. We have significantly expanded our production capacity
with the opening of our new 104,000 sq. ft. plant in Pompano Beach. The future
outlook for DHB is exciting and rewarding given the increased need for homeland
security, the continuing war on terror and the unstable geopolitical environment."

21.     On June 8, 2004, DHB announced that the Company had been awarded a contract

for its recently developed Dorsal Axillary Protection System ("D.A.P.S.") from the U.S. Army's

Robert Morris Acquisition Center. The contract value was "an astounding $239,400,000

covering three years." Commenting on this, defendant Brooks stated:

"This order has an enormous impact on DHB as it marks an entirely new segment
of business and product line to complement our existing Interceptor Body Armor
sold to the U. S. military and its industry leading soft armor systems sold to law
enforcement and federal agencies. Moreover, the contract provides a substantial

- 6 -

guaranteed base of business for the next three years and will allow for immediate higher utilization of our recently opened 104,000 sq. ft. Pompano Beach, Florida manufacturing facility."

22.     Additionally, defendant Hatfield commented: "We are proud of our rapid response to the needs of our customer in designing, developing and producing this latest addition to the Interceptor Outer Tactical Vest. This product is a testament to our industry-leading research and development efforts. We remain committed to fulfilling the needs of our customers, which has been the cornerstone of the success and growth of our Company."

23.     On July 14, 2004, DHB announced that the Company's Armor Group had received approximately $37 million in new purchase and delivery orders since the beginning of July for a wide variety of products including Point Blank's "Interceptor Outer Tactical Vest ("OTV"), the recently developed D.A.P.S., concealable vests and plates, ballistic blankets and other accessories, including orders for the Coalition Forces. Commenting on the announcement, defendant Hatfield stated:

> "As previously stated, we continue to receive new purchase orders at a staggering rate from all market sectors. As a result of our recent expansion, we are clearly poised to accommodate and fulfill the needs of our customers. The planning and positioning of our facilities in Florida and Tennessee have allowed us to strengthen our capability to manufacture quality products and provide solutions on a grander scale."

24.     On August 5, 2004, DHB announced record revenues and earnings for the second quarter ended June 30, 2004, posting its 18th consecutive year-over-year increase in quarterly revenues. The current backlog exceeded $393 million, an 83% increase from the $215 million backlog reported with the Company's first quarter results on May 6, 2004. For the quarter ended June 30, 2004, DHB reported record revenues of $86,066,000, an increase of 52% as compared

- 7 -

to revenues of $56,525,~~~ for the second quarter of 2003. Operating income increased 68% in

the second quarter to a record $12,990,000 as compared to $7,751,000 in the second quarter of

2003. Second quarter 2004 income available to common stockholders was a record $7,570,000

or $0.17 per diluted share, a 91% increase as compared to $3,961,000, or $0.09 per diluted share

in the second quarter of 2003. Gross margins for the second quarter of 2004 were 27.7% versus

27.5% in the second quarter of 2003. Selling, general and administrative expenses ("SG&A

expenses") for the second quarter of 2004 were 12.7% of net sales versus 13.8% of net sales for

the second quarter of 2003.

25.     Commenting on this, defendant Schlegel stated:

"During the second quarter, the Company once again met or exceeded all of its
operating goals which it previously provided as guidance to the financial
community on May 6, 2004. The four income statement items that we deem most
important – net sales, gross margins, selling, general and administrative expenses
and operating margins – all met or exceeded our expectations. We are beginning
to realize significant operating and earnings leverage as our sales increase.
Moreover, the balance sheet continues to strengthen as stockholders' equity has
increased by 30% since December 31, 2003."

26.     Also commenting was defendant Brooks, who stated:

"DHB Industries continues to experience extraordinary growth as order activity
from all four sectors of business -- military, law enforcement, federal agencies and
international--has been expanding at a rapid pace for more than a year. Over the
past ten months, DHB has announced new contracts and purchase orders totaling
more than $415 million. To date, our Point Blank subsidiary, providing
life-saving protection for our troops, has shipped more than 750,000 Interceptor
Outer Tactical Vests to the US military. We believe the future outlook for DHB
and its industry leading soft body armor products remains exceptionally strong."

27.     On October 5, 2004, DHB announced that its Armor Group had recently received

new purchase and delivery orders for a wide variety of its protective products in excess of $35

million from various branches of the United States Military, Federal Government and Domestic

- 8 -

Law Enforcement Agencies. Commenting on this, defendant Hatfield stated:

> "DHB's Armor Group continues to experience a strong level of demand for a
> wide variety of its superior life-saving products. We are pleased and proud of our
> reputation for serving the needs and expectations of our customers. These new
> orders substantiate the confidence of our customers in DHB Armor Group's
> products and underscore our focused strategy and continuing opportunities for
> growth."

28.   On October 29, 2004, DHB announced that its Armor Group had recently received

new purchase and delivery orders, in excess of $19 million, from various branches of the United

States Military, Federal Government and Domestic Law Enforcement Agencies for a wide

variety of its protective products. These new orders directly followed more than $35 million of

new orders announced by the Company on October 5, 2004. Commenting on this, defendant

Hatfield stated:

> "We continue to provide exceptional products and service that exceed the
> requirements and expectations of our customers. These purchase and delivery
> orders substantiate the confidence and demand for DHB Armor Group's products
> and underscores our ability to provide unparalleled levels of service and support."

29.   On November 9, 2004, DHB announced record revenues and earnings for the

third quarter ended September 30, 2004, posting its 19th consecutive year-over-year increase in

quarterly revenues. The current backlog of firm orders exceeded $365 million. For the third

quarter ended September 30, 2004, DHB reported record revenues of $89,410,000 – an increase

of 4% as compared to revenues of $54,417,000 for third quarter 2003. Operating income

increased 130% in third quarter 2004 to a record $13,282,000, as compared to $5,763,000 in the

third quarter of 2003. Third quarter 2004 income available to common stockholders was a record

$8,058,000, or $0.18 per diluted share – a 157% increase as compared to $0.07 per diluted share,

or $3,160,000, in third quarter 2003. Gross margins for third quarter 2004 were 27.8% versus

- 9 -

27.2% in the third quarter of 2003. Selling, general and administrative expenses ("SG&A

expenses") for third quarter 2004 were 13% of net sales versus 16.6% of net sales for third

quarter 2003.

30.     Commenting on these results defendant Hatfield stated:

"We continue to meet or exceed all of our internal operating and performance goals. Our base of business is strengthening in all segments -- military, state and local law enforcement, and federal agencies -- and we believe we are increasing market share in all segments. We are especially encouraged by substantial orders we have recently received that are either for new products or are from new customers. Lastly, we are extremely excited about the prospects of a number of R&D initiatives as well as new products currently in either prototype or field testing stage."

31.     Additionally, defendant Brooks stated:

"Our strength, commitment and leadership position within the body armor industry is extremely strong. Over the past year, DHB has announced new contracts and purchase orders totaling more than $525 million. As of September 30,2004, our Point Blank subsidiary, providing life-saving protection for our troops, has shipped more than 800,000 Interceptor(TM) Outer Tactical Vests to the US military. The surging operating performance and earnings leverage of the Company is largely a result of the significant investments we made over the past three years in R&D, expanding our manufacturing capacity by opening two new facilities totaling over 150,000 square feet, and significantly increasing our base of versatile employees. As we look to the future outlook of DHB, I can only say, this is just the beginning, the future is ours."

32.     On December 23, 2004, DHB announced that its wholly owned subsidiary, Point

Blank Body Armor, Inc. ("Point Blank") had received the first delivery order against the U.S.

Army's contract announced earlier that day for Point Blank's Interceptor(TM) Outer Tactical

Vest ("OTV"). The $100 million delivery order, the largest in the Company's history, was

believed to be the largest delivery order in the history of soft body armor. The Company also

was notified that Point Blank was the only successful offeror for this solicitation. Commenting

- 10 -

on this, defendant Hatfield stated:

"Today is a historic day for our Company. This first delivery order, with a value of $100 Million, is unprecedented in both the Company's history and the history of the soft body armor industry. This delivery order sets the pace for the Company's phenomenal growth throughout 2005."

33.     Also on December 23, 2004, DHB announced the following:

DHB Industries Inc. (AMEX:DHB), the market leader in the rapidly growing protective body armor industry, announced today that its wholly owned subsidiary, Point Blank Body Armor, Inc. ("Point Blank" - http://www.pointblankarmor.com] ), has received notification of a much anticipated, high-profile, three-year contract awarded by the U.S. Army for Point Blank's Interceptor(TM) Outer Tactical Vest (OTV). The Company was also notified that Point Blank was the only successful offeror for this solicitation. With this announcement, the Company's total backlog of orders and contracts now exceeds an unprecedented half-billion dollars.

Commenting on the announcement, David Brooks, Chairman and CEO of DHB Industries, said, "This major military award is a significant milestone for the Company representing the catalyst that will propel and sustain us into the future as the clear, preeminent leader in the design, development and production of technologically superior life-saving body armor systems. The Company continues to build upon its dominant position while maintaining a commanding share of the military market. The future outlook for DHB appears outstanding given the continuing war on tenor and the increased need for homeland security. We are totally committed to maintaining our position of leadership and expect to continue to capture increasingly significant shares of the market.'

Sandra Hatfield, Chief Operating Officer of DHB Industries, added, "This contract award is extremely humbling with the knowledge that the Department of Defense puts this much faith in our Company and its products. We have an enormous sense of pride that our products are protecting and saving the lives of our men and women serving in the armed forces. The Interceptor (TM) OTV award demonstrates the U.S. Department of Defense's confidence in Point Blank's ability to deliver life-saving body armor systems to the armed forces of the United States. Simply stated, this puts us in a league of our own as the world's premier provider of protective solutions surpassing our customers expectations."

34.     On March 15, 2005, DHB announced an agreement with LaSalle Business Credit,

- 11 -

Inc. ("LaSalle"), a N.Y. affiliate of ABN AMRO Bank, whereby LaSalle had increased the asset backed credit facility for DHB Industries from $45 million to $55 million. LaSalle had provided a credit facility to DHB since September 2001. The Credit Agreement provided that the Company may borrow, on a revolving basis, up to $37 million on 85% of eligible accounts receivable. The Company also obtained a secured term loan of $18 million, amortizing at the rate of $2 million per quarter commencing July 2005. DHB represented it would use these funds to meet increased demands for working capital given the continued strong demand for DHB's products.

35.   On March 16, 2005, DHB announced record revenues and earnings for the fourth quarter and full-year ended December 31, 2004, posting its 20th consecutive year-over-year increase in quarterly revenues. The current backlog of firm orders exceeded $415 million. More specifically, the Company stated:

For the fourth quarter ended December 31, 2004, DHB reported record revenues of $90,196,000, an increase of 24% as compared to revenues of $72,916,000 for the fourth quarter of 2003. Gross margins for the fourth quarter of 2004 were 27.3% versus 27.5% in the fourth quarter of 2003. Selling, general and administrative expenses ("SG&A expenses") for the fourth quarter of 2004 were 13.5% of net sales versus 20.2% of net sales for the fourth quarter of 2003.

Operating income for the fourth quarter increased 133% to $12,406,000 as compared to $5,327,000 for 2003. Operating margins in the fourth quarter increased to 13.8% in 2004 from 7.3% in 2003. Fourth quarter 2004 income available to common stockholders was $8,178,000 or $0.18 per diluted share, as compared to $2,762,000, or $0.06 per diluted share in the fourth quarter of 2003. The effective tax rate for the fourth quarter of 2004 was 30.87% as compared to 50.52% in the fourth quarter of 2003. Weighted shares outstanding on a diluted basis for the fourth quarter of 2004 were 46,082,240 as compared to 45,049,051 for the fourth quarter of 2003.

For the full year ended December 31, 2004, total revenues increased 47.9% to a record $340,075,000 as compared to $230,011,000 for the full year ended

- 12 -

December 31, 20___. Gross margins for the 2004 year were 27.7% as compared to 27.5% for the 2003 year. SG&A expenses for the 2004 year decreased to 13.1% of net sales versus 16.2% of net sales for the 2003 year.

Operating income for the 2004 full year increased 90.5% to a record $49,571,000 as compared to $26,016,000 for the 2003 year. Operating margins increased to 14.6% in 2004 from 11.3% in 2003. Income available to common stockholders for the full year 2004 increased 103% to $30,075,000 or $0.67 per diluted share, compared to $14,812,000, or $0.34 per diluted share in 2003. The effective tax rate for the 2004 full year was 36.4% as compared to 42.2% in 2003. Weighted shares outstanding on a diluted basis for the 2004 full year were 45,735,023 as compared to 44,196,802 for the 2003 full year.

\* \* \*

Sandra Hatfield, COO of DHB Industries, commented, "During the fourth quarter, we continued to produce and deliver body armor at a record pace, meeting all of our internal operating and performance goals. Moreover, our success as the sole recipient of the U.S. Army OTV contract awarded in December capped a fourth quarter and full year of extraordinary effort by our company and people. Our business has grown in all segments - military, state and local law enforcement, and federal agencies."

David Brooks, Chairman and CEO of DHB Industries, added, 'During the 2004 full year, DHB announced new contracts and purchase orders totaling approximately $544 million. We have seen our backlog increase over the past three years from $57 million in March 2003, to $132 million in March 2004, to $415 in March 2005. Our Point Blank subsidiary, providing life-saving protection for our troops, has shipped more than 850,000 Interceptor(TM) Outer Tactical Vests to the U.S. military. Whereas our recent growth has been exceptional, we seek additional opportunities to both expand existing market share and enter new geographic markets."

36.    On March 17, 2005, defendants disclosed the following in their Form 10-K/A:

On January 3, 2005, a class action lawsuit was filed against us in the Circuit Court of the Seventeenth Judicial Circuit in Broward County, Florida by a police organization and individual police officers, because of concerns regarding the effectiveness and durability of body armor with high concentrations of Zylon in the Company's bullet-resistant soft body armor (vests). In February 2005, we reached a preliminary settlement with respect to the class action lawsuit filed, subject to final Court approval. The Company does not expect this settlement to have a material adverse effect on its financial position.

- 13 -

37. On Apri.. .5, 2005, defendants filed with the SEC a Form 8-K titled "Change in

Accountant." In the Form 8-K, the Company stated:

> On April 8, 2005, DHB Industries, Inc. (the "Company") was notified that Weiser
> LLP ("Weiser") had declined to stand for re-election as the Company's principal
> independent accountants. Weiser had served as the Company's principal
> independent accountants since August 27, 2003. Notwithstanding its decision not
> to stand for re-election, Weiser has advised the Company that it intends to
> complete its audit of the Company's internal control over financial reporting as of
> December 31, 2004 and upon completion of such audit, to provide its opinion
> regarding such controls as of such date (the "Weiser Opinion").

38. On April 27, 2005, DHB announced that its subsidiary, Point Blank Body Armor,

had received a $10,032,960 delivery order pursuant to its three-year contract with the U.S. Army

for Point Blank Interceptor Outer Tactical Vests. As previously mentioned on December 23,

2004, DHB Industries announced that it had been awarded the high-profile contract to be the U.S.

Army's sole provider of the Interceptor Outer Tactical Vest. Commenting on this, defendant

Hatfield stated:

> "This is yet another example demonstrating our customer's confidence in, and
> satisfaction with, our products. Our products have been subjected to the worse
> conditions possible in the battlefields of Afghanistan and Iraq, and we know that
> many men and women are coming back alive as a result of our body armor. Our
> products have received nothing but praise from our customers and the soldiers in
> field. We get letters from soldiers telling us how our products saved their lives,
> which is the most rewarding part of what we do. "Ms. Hatfield noted a recent
> news report by The Associated Press, where Col. Clifford Cloonan, a doctor at
> Walter Reed Army Medical Center was quoted as saying, 'Hands down, body
> armor is much more effective at saving lives than any medicine we've brought to
> the battlefield."

39. On May 10, 2005, Point Blank Body Armor Inc., a subsidiary of DHB, affirmed

the quality and effectiveness, and reiterated the unprecedented combat success, of Interceptor

Outer Tactical Vests manufactured by Point Blank Armor Inc. A precautionary recall notice of

- 14 -

5,277 Interceptor vests ...s issued by the Marine Corps on May 4, 200. As noted in a May 7, 2005 story in the *Marine Corps Times*, "The Marine Corps questioned the accuracy of the government test results (of Interceptor OTV) all along. The Corps pulled samples from some of the challenged lots and had them tested at a private (government-approved) commercial lab." The article noted that Marine Corps officials said further testing showed "that the vests meet safety standards and do not put Marines at increased risk of injury." Point Blank Body Armor believed that multiple and consistent test results by an independent, government approved lab provided assurance that the vests were properly manufactured to perform as specified. A May 9, 2005, *USA Today* article quoted Brig. Gen. William Catto, head of Marine Corps Systems Command, as stating "there is no evidence to indicate problems with the vests in use ... but the Marines have no choice but to recall them because the questions prompted by media coverage will cause doubts in the minds of our guys using the vests." General (Ret.) Larry Ellis, President of DHB stated: "We categorically stand behind the quality and effectiveness of Interceptor OTVs manufactured by Point Blank."

40. Also commenting on this was defendant Hatfield, who stated:

"Conflicting interpretations of test protocols by both a government lab and a government approved independent lab led to inconsistent test results. As a result, the media has called into question the effectiveness of a product that has saved thousands of lives."

41. On May 10, 2005, DHB announced results for the first quarter ended March 31, 2005. DHB posted record first quarter revenues of over $85 million and its 21st consecutive year-over-year increase in quarterly revenues. For the first quarter ended March 31, 2005, DHB reported record first quarter revenues of $85,465,000, an increase of 14.9% as compared to

- 15 -

revenues of $74,403,0~ ~or the first quarter of 2004. Operating income increased 15.4% in the first quarter of 2005 to a record for the first quarter of $12,571,000 as compared to $10,893,000 in the first quarter of 2004. First quarter 2005 income available to common stockholders was $7,619,000, a 21.5% increase as compared to $6,269,000 in the first quarter of 2004. First quarter 2005 earnings per share was $0.17 per diluted share, a 21.4% increase as compared to $0.14 per diluted share in the first quarter of 2004.

42.     Commenting on these results, defendant Hatfield stated: "We are pleased with the Company's financial performance for the first quarter. The Company had its best first quarter ever with revenues of over $85 million. We continue to work hard to service our customers and provide them with the best possible body armor."

43.     On May 26, 2005, DHB announced that the Company had granted warrants to purchase shares of the Company's common stock to two of its new employees: Ishmon Burks, Senior Vice President, Communications, and Manuel Rubio, Chief of Staff/Senior Vice President. Mr. Burks received a warrant that allows him to purchase up to 10,000 shares of the Company's common stock at an exercise price of $7.66 per share on each of the next five anniversaries of his employment with the Company provided that he is employed by the Company at such time. Mr. Rubio received a warrant that allows him to purchase up to 100,000 shares of the Company's common stock at an exercise price of $7.66 per share on each of the next five anniversaries of his employment with the Company provided that he is employed by the Company at such time. The exercise price of the warrant was set to the market price of the Company's common stock as of the date of the grant. Additionally, DHB stated:

Commenting on today's announcement, Gen. (Ret.) Larry R. Ellis, DHB's

- 16 -

President stateu, these purchase and delivery orders are a testament to the
confidence of the quality and reliability of DHB's products in protecting the lives
of America's heroes. Furthermore, they continue to demonstrate the confidence
that our armed forces, federal, state and local law enforcement personnel have in
our protective body armor products." Gen. (Ret.) Larry R. Ellis continued, "We've
continued to see strong demand for our products across all customer segments
during the second quarter and believe our leading edge technology provides us
with a competitive advantage in servicing our clientele. We remain focused on
increasing our market share and continuing to develop first class, high-quality
products for the men and women who save lives everyday."

44.     On June 15, 2005, DHB announced that the Company's Armor Group, Point

Blank Body Armor, Inc. and Protective Apparel Corporation of America ("PACA") had received

purchase and delivery orders during the preceding few weeks for a wide variety of its protective

products. The total value of new contracts are in excess of $13.6 million and are from various

branches of the United States military, federal government and domestic law enforcement

agencies. This followed the Company's previously announced delivery orders from the United

States Army for PACA's Countermine Ensemble, bringing the total value of new contract orders

over the same time frame to over $18.8 million.

45.     On July 20, 2005, DHB announced that its subsidiary, Point Blank Body Armor

had received $10.1 million in new orders from the United States Army for various components of

its Interceptor(TM) OTV System, complementing its exclusive contract award from the U.S.

Army for Point Blank's Interceptor OTV received in December 2004. Additionally, DHB stated:

Commenting on today's announcement, Gen. (Ret.) Larry R. Ellis, DHB's
President, said, 'We are pleased that the U.S. Army continues to see the value that
our advanced body armor provides in protecting our country's men and women in
the armed forces. We pride ourselves on the quality and reliability of our products
and believe these new orders are a further testament to the U.S. Army's
confidence in our company."

Ellis continued, "It remains our goal to be the preeminent supplier of body armor

- 17 -

for the U.S. Arn—J Forces, as well as federal, state and law eniurcement agencies. Our products continue to exceed industry standards, as the protection of lives is of the utmost importance. DHB's superior talent continues to bring new and innovative products to the marketplace and we look forward to working with the U.S. Army and other branches of the Armed Forces in the years ahead."

46.    On July 28, 2005, DHB issued a press release in which it announced its financial

results for the second quarter of fiscal year 2005. Therein, the Company stated:

For the second quarter ended June 30, 2005, DHB reported revenues of $88,196,000 as compared to revenues of $86,066,000 in the second quarter of 2004. DHB was cash flow positive, generating $13,252,000 in cash from operations this quarter. During the second quarter of 2004, DHB was cash flow negative, using cash in operations of $16,257,000. Operating income was $12,642,000 as compared to $12,990,000 in the comparable year-ago period. Income available to common stockholders was $7,598,000 as compared to $7,570,000 in the second quarter of 2004. Earnings per share was $0.17 per diluted share as compared to $0.17 per diluted share reported in the year-ago period. The effective tax rate was 35.5% as compared to 39.1% in the second quarter last year. Weighted shares outstanding on a diluted basis were 46,021,501 as compared to 45,739,277 in the comparable 2004 period.

The gross profit margin for the second quarter of 2005 was 27.2% versus 27.7% in the comparable year-ago period. Selling, general and administrative expenses were 12.9% of net sales versus 12.7% of net sales for the second quarter of 2004.

For the six months ended June 30, 2005, DHB reported record revenues of $173,661,000 as compared to revenues of $160,469,000 for the first six months of 2004. DHB was cash flow positive during this period, generating $3,291,000 of cash from operations. During the second quarter of 2004, the Company was cash flow negative, using cash in operations of $19,425,000. Operating income increased to a record $25,213,000 as compared to $23,883,000 in the first six months of 2004. Income available to common stockholders was a record $15,217,000 or $0.33 per diluted share as compared to $13,839,000 or $0.30 per diluted share in comparable period last year. The effective tax rate was 35.5% as compared to 39.6% reported in the comparable six month period of 2004.

Stockholders' equity rose to $92,799,000 at June 30, 2005, a 20.5% increase as compared to $77,026,000 at year-end December 31, 2004 and an increase of 8.9% as compared to $85,201,000 at March 31, 2005.

Commenting on the Company's second quarter performance, General (Ret.) Larry

- 18 -

Ellis said, "I am very pleased with the progress we've made this past quarter, as we continue to execute on our strategy to become the leading and trusted provider of protective body armor to the U.S. Armed Forces, and our nation's federal, state and law enforcement agencies. Our second quarter results are indicative of the ongoing demand for our products and reinforce the quality and reliability that our customers have come to depend upon. The management team at DHB remains focused on driving both top-and bottom-line results and we believe our efforts to strengthen our senior staff, improve business processes and expand our market presence both domestically and internationally will lead to enhanced shareholder value over the tong-term."

Sandra Hatfield, the Company's Chief Operating Officer, said, "We continue to work very closely with our customers and partners to ensure that our products and services exceed their expectations. And despite ongoing industry-wide supply issues, we have continued to meet customer demand. I'm encouraged by the strong receptivity our products have received in the market place, and the steps we are taking to drive product innovation."

47.     The statements contained in ¶¶17-46 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) DHB's body armor products were unsafe and defective; (2) the Company knew that DHB's body armor products were unsafe and defective, but continued to falsely represent that its body armor products were safe and of high quality; (3) defendants knew and/or recklessly disregarded that continued sales of its unsafe and defective body armor products could have a material adverse effect on DHB's finances; and (4) DHB lacked adequate internal controls and, as a result, was unable to determine the true financial impact of withdrawal of any of its products.

## Disclosures at the End of the Class Period

48.     On August 30, 2005, prior to the opening of the market, DHB announced that, although it remains confident in the safety and performance of its body armor products containing Zylon(R), it had discontinued the use of Zylon(R) in its bullet-resistant products on August 24, 2005. The Company had ceased production of all Zylon-containing bullet resistant

- 19 -

products due to the NIJ decision to revoke the NIJ's previously issued certifications of all vests

in the marketplace containing Zylon. The Company also announced that it would be

implementing a Voluntary Replacement Program to assist its customers who presently have non

NIJ-compliant Zylon(R) body armor. Additionally, the Company stated:

> It is important to note that this Voluntary Replacement Program is not a product recall. This action is a result of the decertification by the NIJ of body armor with Zylon(R), which will result in certain customers having body armor that will not be in compliance with the new NIJ requirements. This program will assist the law enforcement community in replacing its Zylon(R) body armor with, NIJ-compliant body armor.

> "We will diligently work with our customers to address these issues. Officer safety is and will remain our number one priority," stated General (Ret.) Larry Ellis, DHB's President. He continued, "It is our intent to work with the law enforcement community to supply them with replacement vests as rapidly as possible. We encourage all those presently using bullet resistant body armor containing Zylon(R) to continue wearing their body armor as recommended by the Department of Justice, until their vest have been replaced or exchanged. We believe that, based upon testing and research, that our vests are safe for use by officers in the field."

> The Company will record a charge to third quarter earnings to account for the anticipated cost of the Zylon(R) Replacement Program and discontinued sales of products that contain Zylon(R). The amount of the third quarter charge has not yet been finalized, but is not expected to exceed $60 million.

49.     That same day, August 30, 2005, as a result of this news, shares of DHB fell

$1.56 per share, or 23.42 percent, to close at $5.10 per share on unusually heavy trading.

## CLASS ACTION ALLEGATIONS

50.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the

securities of DHB between April 21, 2004 and August 29, 2005, inclusive (the "Class Period")

and who were damaged thereby. Excluded from the Class are defendants, the officers and

- 20 -

directors of the Compan, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

51.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, DHB's securities were actively traded on the American Stock Exchange ("AMEX"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by DHB or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

52.    Plaintiffs claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

53.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

54.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the

- 21 -

Class Period misrepresented material facts about the business, operations and management of DHB; and

   (c) to what extent the members of the Class have sustained damages and the proper measure of damages.

  55. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

  56. The market for DHB's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, DHB's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired DHB securities relying upon the integrity of the market price of DHB's securities and market information relating to DHB, and have been damaged thereby.

  57. During the Class Period, defendants materially misled the investing public, thereby inflating the price of DHB's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented

the truth about the Company, its business and operations, as alleged herein.

58.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about DHB's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of DHB and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

59.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

60.     During the Class Period, Plaintiff and the Class purchased securities of DHB at artificially inflated prices and were damaged thereby. The price of DHB common stock declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## ADDITIONAL SCIENTER ALLEGATIONS

61.     As alleged herein, defendants acted with scienter in that defendants knew that the

- 23 -

public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants participated in the fraudulent scheme alleged herein, by virtue of their receipt of information reflecting the true facts concerning DHB, their control over and/or receipt and/or modification of DHB's allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential proprietary information concerning DHB.

62. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

63. In addition, several insiders took advantage of the fact that DHB stock was trading at artificially inflated prices and disposed of 9,767,570 shares for gross proceeds totaling $191,195,114.07 evidenced by the chart below:

- 24 -

| NAME/TITLE | DATE | # OF SHARES | PRICE PER SHARE | GROSS PROCEEDS |
|---|---|---|---|---|
| David H. Brooks CEO | 11/29/2004 | 3,700,000 | $18.900 | $69,930,000.00 |
| | 12/22/2004 | 400,000 | $18.598 | $7,439,200.00 |
| | 12/23/2004 | 84,100 | $20.064 | $1,687,382.40 |
| | 12/27/2004 | 2,538,744 | $20.945 | $53,173,993.08 |
| | 12/28/2004 | 858,267 | $19.877 | $17,059,773.15 |
| | 12/29/2004 | 1,916,914 | $19.100 | $36,613,057.40 |
| | | **Total Shares Sold: 9,498,025** | | **Gross Proceeds: $185,903,406.00** |
| Sandra Hatfield COO | 11/29/2004 | 180,119 | $19.610 | $3,532,133.59 |
| | 12/28/2004 | 24,426 | $19.757 | $482,584.48 |
| | 12/29/2004 | 65,000 | $19.646 | $1,276,990.00 |
| | | **Total Shares Sold: 269,545** | | **Gross Proceeds: $35,291,708.07** |
| | | **Total Shares Sold: 9,767,570** | | **Total Gross Proceeds: $191,195,114.07** |

### Applicability Of Presumption Of Reliance:
### Fraud-On-The-Market Doctrine

64.     At all relevant times, the market for DHB securities was an efficient market for

the following reasons, among others:

(a)     DHB stock met the requirements for listing, and was listed and actively

traded on the AMEX, a highly efficient and automated market;

(b)     As a regulated issuer, DHB filed periodic public reports with the SEC and

the AMEX;

(c)     DHB regularly communicated with public investors via established market

communication mechanisms, including through regular disseminations of press releases on the

national circuits of major newswire services and through other wide-ranging public disclosures,

- 25 -

such as communications with the financial press and other similar reporting services; and

(d)     DHB was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

## NO SAFE HARBOR

65.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward- looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of DHB who knew that those statements were false when made.

## FIRST CLAIM
### Violation Of Section 10(b) Of
### The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against All Defendants

66.     Plaintiff repeats and realleges each and every allegation contained above as if fully

- 26 -

set forth herein.

67.    As a result of the foregoing, the market for DHB securities promptly digested current information regarding DHB from all publicly available sources and reflected such information in DHB's stock price. Under these circumstances, all purchasers of DHB securities during the Class Period suffered similar injury through their purchase of DHB securities at artificially inflated prices and a presumption of reliance applies.

68.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (I) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase DHB securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

69.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for DHB securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

70.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business,

- 27 -

operations and future prospects of DHB as specified herein.

71.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of DHB's value and performance and continued substantial growth, which included the making of or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about DHB and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of DHB securities during the Class Period.

72.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (I) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they

- 28 -

73.      The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing DHB's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

74.      As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of DHB securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of DHB's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired DHB securities during the Class Period at artificially high prices and were damaged thereby.

75.      At the time of said misrepresentations and omissions, Plaintiff and other members

- 29 -

of the Class were igno\. _. of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that DHB was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their DHB securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

76.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

77.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

78.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

79.     The Individual Defendants acted as controlling persons of DHB within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various

- 30 -

statements which Plaint... contends are false and misleading. The Indi...ual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

80. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

81. As set forth above, DHB and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and approving Plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of

- 31 -

defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

      (c)    Awarding Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

      (d)    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

    Plaintiff hereby demands a trial by jury.

DATED: October 18, 2005            **KIRBY, MCINERNEY & SQUIRE, LLP**

By _Pamela E Kulsrud_
      Pamela E. Kulsrud (PK-4310)
830 Third Ave, 10th Floor
New York, New York 10022
Telephone:   (212) 317-2300
Facsimile:   (212) 751-2540

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Michael Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:   (310) 201-9150
Facsimile:   (310) 201-9160

*Attorneys for Plaintiff*

- 32 -

**GLANCY BINKOW & GOLDBERG LLP**
**SWORN CERTIFICATION OF PLAINTIFF**
**DHB INDUSTRIES, INC. SECURITIES LITIGATION**

I, Gary Gelman, certify that:

1.      I have reviewed the Complaint and authorized its filing.

2.      I did not purchase DHB INDUSTRIES, INC., the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.      I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.      My transactions in DHB INDUSTRIES, INC. during the Class Period set forth in the Complaint are as follows:

        SEE ATTACHED "EXHIBIT A"

5.      I have not served as a representative party on behalf of a class under this title during the last three years.

6.      I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

☐ Check here if you are a current employee or former employee of the defendant Company.

I declare under penalty of perjury that the foregoing are true and correct statements.

Dated:   10/13/05

                                        (Please Sign Your Name Above)
                                        Gary Gelman

**FAX BACK TO (310) 201-9160**

## EXHIBIT A

### Transactions of Gary Gelman in DHB Industries, Inc.

| TRANSACTION DATE | TRANSACTION TYPE | # OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| 08 11 2005 | Purchase | 500 | $6.53 |
| 08 10 2005 | Purchase | 1000 | $6.74 |
| 08 09 2005 | Purchase | 1000 | $6.85 |
| 08 08 2005 | Purchase | 2000 | $7.03 |
| 05 05 2005 | Purchase | 1000 | 8.05 |
| 04 15 2005 | Purchase | 1000 | $10.25 |
| 04 08 2005 | Purchase | 500 | $9.29 |
| 02 18 2005 | Purchase | 2000 | $13.97 |
| 01 21 2005 | Purchase | 1000 | $17.05 |

Also
9/01/05   Purchase
9/16/05   Purchase

6000
1000

$5
$6.89